## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Avenue
Tucson, AZ 85701,

HUMANE SOCIETY INTERNATIONAL,
1255 23rd Street NW, Suite 450
Washington, DC 20037,

THE HUMANE SOCIETY OF THE UNITED
STATES,
1255 23rd Street NW, Suite 450
Washington, DC 20037,

BORN FREE USA,
8737 Colesville Road, Suite 715
Silver Spring, MD 20910,

*and*

NATURAL RESOURCES DEFENSE
COUNCIL, INC.,
40 West 20th Street 11th floor
New York, NY 10011,

    *Plaintiffs*,

      v.

DAVID BERNHARDT, *in his official
capacity as Secretary of the U.S. Department
of the Interior*,
1849 C Street NW
Washington, DC 20240,

*and*

U.S. FISH AND WILDLIFE SERVICE,
1849 C Street NW
Washington, DC 20240

    *Defendants*.

Case No.

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Plaintiffs Center for Biological Diversity, Humane Society International, The Humane Society of the United States, Born Free USA, and the Natural Resources Defense Council (collectively "Plaintiffs") challenge the failure of Secretary of the Interior David Bernhardt and the U.S. Fish and Wildlife Service (collectively "the Service" or "Defendants") to: (1) make a required 12-month finding on Plaintiffs' petition to list seven species of pangolins under the Endangered Species Act ("ESA"), and (2) issue a final decision on Plaintiffs' petition to treat the seven unlisted pangolin species as endangered based on their similarity of appearance to the ESA-listed Temminck's ground pangolin.

2.      Pangolins, known for their characteristic scales that cover the entire dorsal surface of their bodies, are gravely endangered.

3.      Scientists estimate that more than a million pangolins were poached between 2004 and 2014 alone for their scales and meat, equaling around 300 pangolins poached every day and making pangolins the most heavily-trafficked mammal in the world. An extreme level of poaching has continued in recent years.

4.      Pangolins taken from the wild are mostly destined for markets in China and Vietnam, where it is erroneously believed that pangolin scales cure a range of ailments, and where pangolin meat and fetuses are consumed to display social status and wealth.

5.      Historically, the United States was a large market for pangolin leather products. A U.S. market for pangolins remains today. A 2019 study documented ongoing trade in pangolin leather products on eBay. A 2015 report by Plaintiff Humane Society International found "medicinal" products containing or likely to contain pangolin parts openly for sale online and at

U.S. stores, and such products remain openly for sale today. And a 2017 report found the United States had 127 pangolin trafficking incidents between 2010 and 2015—second only to China.

6.      There are eight pangolin species worldwide—four in sub-Saharan Africa and four in Asia. The species include the Temminck's ground pangolin (*M. temminckii*), Chinese pangolin (*M. pentadactyla*), Sunda pangolin (*M. javanica*), Philippine pangolin (*M. culionensis*), Indian pangolin (*M. crassicaudata*), tree (or white-bellied) pangolin (*M. tricuspis*), giant ground pangolin (*M. gigantean*), and long-tailed (or black-bellied) pangolin (*M. tetradactyla*). The eight species are difficult to distinguish from one another, especially when they are traded in the common form of detached or powdered scales.

7.      All pangolin species are threatened by illegal wildlife trafficking and habitat destruction. All eight species are listed on the International Union for Conservation of Nature's ("IUCN") Red List of Threatened Species. All species are also included in Appendix I of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES").

8.      However, only one species of pangolin is currently protected under the U.S. Endangered Species Act: the Temminck's ground pangolin. The seven other pangolin species are not listed under the ESA and thus have not been afforded the ESA's protections, including the prohibition on interstate trade.

9.      Despite existing CITES protections, several recent seizures highlight the staggering number of pangolins still being trafficked. For example, more than 28 tons of scales—representing an estimated 38,000 individual pangolins—were confiscated during two seizures in April 2019 in Singapore. In Malaysia in February 2019, officials seized around 33 tons of pangolin carcasses, live pangolins, and pangolin scales, in two separate events.

10.     In addition to wildlife trafficking, habitat destruction further threatens pangolin survival. Oil, logging, and mining industries are causing a rapid rate of deforestation in the pangolins' African habitat, increasing road density and causing habitat fragmentation. In pangolins' Asian habitat, logging and the conversion of forests to fiber and palm oil plantations are causing major habitat loss and increased poaching.

11.     Despite their elusive and nocturnal behavior, pangolins are very easy to catch in the wild. Pangolins' main defense when threatened by predators is to roll up into a ball, thereby making them an extremely easy and attractive target for poachers as capture requires no special skill or even the use of a weapon or trap. As such, pangolins are highly vulnerable to exploitation and trade.

12.     Recognizing the serious threats pangolins face, on July 15, 2015, several Plaintiffs petitioned to list seven pangolin species as endangered under the ESA due to overutilization, habitat destruction, and inadequate regulatory mechanisms. However, Plaintiffs feared the unlisted pangolin species and the already-listed Temminck's ground pangolin could suffer further precipitous declines while the Service conducts a comprehensive status review in response to the ESA petition. Plaintiffs thus submitted a second petition, also on July 15, 2015, requesting that the Service issue a rulemaking to treat the seven unlisted pangolin species as endangered based on their similarity of appearance to the ESA-listed Temminck's ground pangolin ("ESA Section 4(e) petition"). 16 U.S.C. § 1533(e).

13.     The ESA requires the Secretary of the Interior, through the U.S. Fish and Wildlife Service, to determine if listing "may be warranted" based on "substantial scientific or commercial information" presented by a petition within 90 days of its receipt ("90-day finding"). 16 U.S.C. § 1533(b)(3)(A).

14.     The Service issued a 90-day finding on March 16, 2016, determining that listing all seven pangolin species "may be warranted" based on the factors and evidence identified in the petition. 81 Fed. Reg. 14,058 (Mar. 16, 2016).

15.     Following a positive 90-day finding, the ESA requires the Service to determine if listing is warranted within 12 months of receiving a petition ("12-month finding"). 16 U.S.C. § 1533(b)(3)(B).

16.     More than four years have passed since Plaintiffs submitted their ESA listing petition, and nearly four years have passed since the Service found that listing all seven pangolin species "may be warranted." Yet the Service has not issued the required 12-month finding as of the date of this Complaint. The Service's failure to move the ESA listing process forward pursuant to the ESA's deadlines places pangolins at greater risk of extinction.

17.     The Administrative Procedure Act ("APA") requires each agency to conclude a petition for rulemaking within a reasonable time. 5 U.S.C. § 555(b), (e).

18.     More than four years have passed since Plaintiffs submitted their ESA Section 4(e) petition. Yet the Service has not issued a final response to Plaintiffs' petition as of the date of this Complaint. The Service's failure to respond and protect pangolins under ESA Section 4(e) places pangolins at greater risk of extinction.

19.     As such, the Service is violating both the ESA and the APA. Through this Complaint, Plaintiffs seek a declaratory judgment and injunctive relief to compel the Service to issue a 12-month finding on Plaintiffs' petition by a date certain, and while considering listing, to substantively respond to the ESA Section 4(e) petition, as well as fees and costs associated with this litigation.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 16 U.S.C.

§ 1540(c) and (g)(1)(C) (actions arising under the ESA's citizen suit provision), 28 U.S.C.

§ 1331 (actions arising under the laws of the United States), 28 U.S.C. § 1346 (actions against

the United States), and 5 U.S.C. § 702 (actions for those adversely affected by agency action

under the APA).

21.     This action arises under the ESA, 16 U.S.C. §§ 1531–1544, and the APA, 5

U.S.C. §§ 551–559; 701–706, and the requested relief is authorized under 5 U.S.C. § 706 (APA),

16 U.S.C. § 1540(g) (ESA), 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 2202 (injunctive

relief), and the Court's equitable powers.

22.     The ESA and APA provide waivers of the federal government's sovereign

immunity. 16 U.S.C. § 1540(g); 5 U.S.C. § 702.

23.     Plaintiffs provided formal notice to the Service of their intent to file suit under the

ESA on November 13, 2019, more than 60 days prior to filing this Complaint, consistent with

the ESA's statutory requirements. 16 U.S.C. § 1540(g)(2).

24.     Defendant David Bernhardt, Secretary of the Interior, received a copy of

Plaintiffs' notice letter via certified mail on November 19, 2019. Defendant U.S. Fish and

Wildlife Service received a copy of Plaintiffs' notice letter, directed to Ms. Margaret Everson,

Principal Deputy Director Exercising the Authority of the Director of the U.S. Fish and Wildlife

Service, via certified mail on November 19, 2019.

25.     Defendants have not remedied their continuing ESA and APA violations as of the

date of this Complaint. Therefore, an actual controversy exists between the parties under 28

U.S.C. § 2201.

26.     Venue in this Court is proper under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e)(1) because Defendants reside and are headquartered in this judicial district and a substantial part of the events, omissions, and violations giving rise to the claim occurred in this district.

## PARTIES

### Plaintiffs

27.     Plaintiff Center for Biological Diversity ("the Center") is a 501(c)(3) nonprofit corporation incorporated in the State of California. The Center maintains offices across the country, including in Washington, DC; California; Arizona; Oregon; Florida; and Washington State, and in Baja California Sur, Mexico, as well as other locations. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats both in the United States and abroad. The Center's International Program works to protect global biodiversity by using U.S. and international law to hold governments accountable for threatening imperiled species wherever they are found. In pursuit of this mission, the Center has been actively involved in securing protections for species abroad, including pangolins. In addition to Plaintiffs' efforts to protect pangolins under the ESA, the Center and its allies worked to secure protections under CITES in 2016, resulting in a ban on the international, commercial trade of pangolins. The Center has nearly 70,000 active members and approximately 1.6 million online activists living both in the United States and other nations.

28.     Plaintiff Humane Society International ("HSI") is a global non-profit organization headquartered in Washington, D.C., with offices and programs around the world. HSI works to combat animal abuse and exploitation and to promote animal protection and welfare. HSI actively advocates against unsustainable trade in wildlife, including pangolins. HSI was

instrumental in securing improved legal protections for pangolins at CITES and has advocated for improved domestic protections under the ESA. Multiple HSI employees are members of the IUCN Pangolin Specialist Group. In partnership with government agencies in Vietnam, HSI developed and implemented a national wildlife education curriculum to teach children about pangolin conservation and the threats to their survival. HSI regularly monitors, assesses, and issues reports on the pangolin trade, including the sale of pangolin parts and products within the United States, and has provided direct care and rehabilitation services to individual pangolins seized from the illegal pangolin trade in both Asia and Africa.

29.     Plaintiff The Humane Society of the United States ("HSUS") is a non-profit charitable organization incorporated in 1954 and headquartered in Washington, D.C. HSUS is the nation's largest animal protection organization, with millions of members and constituents. HSUS' mission is to promote the humane treatment of animals and to foster respect, understanding, and compassion for all creatures. HSUS has shown particular interest in endangered and threatened species, and supports efforts aimed at the protection and recovery of such species, including pangolins, and their habitats. HSUS regularly submits comments to government agencies concerning proposed actions that would affect wild animals, including listing and delisting decisions pursuant to the ESA. HSUS was a co-petitioner for both petitions that are the subject of this action. HSUS publishes a magazine and maintains a website for its members and the general public, where it regularly disseminates information concerning the protection of wild animals in the United States and abroad, including government decisions that affect wildlife.

30.     Plaintiff Born Free USA ("BFUSA") is a nonprofit 501(c)(3) incorporated in the state of California, and it maintains its headquarters in Silver Spring, Maryland. BFUSA is a

global leader in animal welfare and wildlife conservation, advocating against the use of animals in entertainment; the trade in wildlife as pets, trapping and fur; and the destructive international wildlife trade. BFUSA is actively working in West and Central Africa to stop the illegal trade in CITES-protected animals and their parts through capacity-building projects and trainings with law enforcement, rangers, and judicial branches as well as through public education. The organization also works to secure protections under CITES.

31.     Plaintiff Natural Resources Defense Council ("NRDC") is a national non-profit organization with hundreds of thousands of members. Part of NRDC's mission is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends. NRDC is headquartered in New York, New York, with offices in Washington, D.C.; San Francisco and Santa Monica, California; Chicago, Illinois; Bozeman, Montana; and Beijing, China. NRDC works at the state, federal, and international levels to advance legal protections for endangered and threatened wildlife, including pangolins.

32.     Plaintiff organizations and their members and supporters derive professional, scientific, educational, recreational, conservation, aesthetic, and other benefits from pangolins in the wild. Plaintiffs have members who visited and have concrete plans to return to pangolin habitat in Africa and Asia.

33.     For example, Mr. Brett Hartl is a Center member who looks for, photographs, and records videos of wildlife both in the United States and globally. Thus far, Mr. Hartl has observed 400 species of mammals and 3,400 species of birds around the world, and he has a life goal of seeing many more. He has tried on many occasions to see pangolins, and most recently observed the long-tailed (or black-bellied) pangolin in the Central African Republican in August 2019. During this trip, Mr. Hartl also attempted to observe the giant ground pangolin and tree (or

white-bellied) pangolin. He has made several other trips to attempt to see pangolins in many parts of the various pangolin species' habitats. In May of 2019, he visited Singapore and peninsular Malaysia and tried to observe the Sunda pangolin. In July 2018, Mr. Hartl traveled to central India and attempted to observe the Indian pangolin. In March of 2017, he visited Sri Lanka and tried to observe the Indian pangolin. In January of 2017, he visited Ghana and tried to observe the tree (or white-bellied) pangolin and the giant ground pangolin. In 2014, Mr. Hartl traveled to peninsular Malaysia and Borneo and attempted to observe the Sunda pangolin.

34.     Mr. Hartl has concrete plans to return to pangolin habitat. He will be traveling to Madagascar, southern Africa, and Uganda in 2020 to try to observe the ESA-listed Temminck's ground pangolin and the tree pangolin. In 2021, Mr. Hartl will be traveling to northeast India, Bhutan, and Sri Lanka to try and observe the Chinese pangolin as well as the Indian pangolin. In 2022, he will return to Borneo and Singapore and again attempt to observe the Sunda pangolin. In 2023, Mr. Hartl will travel to Gabon to attempt to observe the giant ground pangolin and again observe the black-bellied pangolin.

35.     Adam Peyman is Programs and Operations Manager for the Wildlife Department of HSI and a supporter of HSUS. During the past decade, Mr. Peyman has made three trips to pangolin habitat with the goal of seeing pangolins in the wild. In 2015, Mr. Peyman travelled to South Africa and attempted to view the Temminck's pangolin. In October 2019, Mr. Peyman travelled to Vietnam and attempted to view Sunda and Chinese pangolins. In November 2019, Mr. Peyman travelled to Malaysia and attempted to view the Sunda pangolin. Additionally, prior to his 2015 trip to South Africa, Mr. Peyman visited a pangolin rescue and rehabilitation center in Vietnam, where he viewed and interacted with rehabilitating pangolins. Mr. Peyman has

concrete plans to return to pangolin habitat. In 2020, he will travel to Central Vietnam to attempt

to view Sunda and Chinese pangolins in the wild.

36.     Mr. Peyman has also worked to protect pangolins worldwide in a professional

capacity. Mr. Peyman is co-chair of the Species Survival Network Pangolin Working Group and

has worked with an international coalition of NGOs to assess and improve enforcement

mechanisms to ensure strict protection measures stay in place to prevent the illegal harvest and

trade of pangolins and their parts. In the course of his work with HSI, Mr. Peyman authored and

personally illustrated a children's book titled "I'm A Little Pangolin," published in 2017, which

has been used in partnership with government entities and NGOs for wildlife education in

Vietnam, China, and Malaysia.

37.     Sumanth Bindumadhav is a Campaign Manager for HSI and a supporter of

HSUS. Mr. Bindumadhav leads HSI's efforts to protect pangolins in India by cracking down on

the illegal trade in live pangolins and their parts. Mr. Bindumadhav regularly engages with law

enforcement agencies to help gather intelligence on the illegal pangolin trade, rescue live

animals, and seize pangolin scales from trade. In the past two years, Bindumadhav and his

colleagues have helped rescue about 12 live pangolins and seize about 25 kilograms of pangolin

scales. Before beginning his employment with HSI in 2016, Mr. Bindumadhav worked and

volunteered with other organizations to protect and care for pangolins for about 17 years, three of

which were spent running his own wildlife rescue and rehabilitation organization.

38.     Mr. Bindumadhav frequently travels to Indian pangolin habitat in order to view or

attempt to view pangolins in the wild. For example, in September and December 2019, Mr.

Bindumadhav made trips to Bannerghatta National Park in Bangalore to attempt to view the

Indian pangolin; in December, he personally saw one pangolin. In June 2019, Mr. Bindumadhav

travelled to the Forests of Bellary district in Karnataka (where most live Indian pangolins rescued from the illegal wildlife trade come from) and saw one pangolin crossing a forest road. In November 2018, Mr. Bindumadhav travelled to Mahabaleshwar, Maharahstra for a 30-day period to attempt to view, and set camera traps for, Indian pangolins and other small wildlife. In or around March 2017, Mr. Bindumadhav travelled to the Agumbe Rainforest Research Station to attempt to view the Indian pangolin, where he watched a resident pangolin emerge from a burrow and walk down a forest path. Additionally, Mr. Bindumadhav sighted wild pangolins about 30 times between March and December of 2015 as he worked to build a wildlife research station in Doddamarg, Maharashtra.

39.     Mr. Bindumadhav has concrete plans to return to Indian pangolin habitat in order to attempt to view them in the wild. He has applied for government permits to travel to Bannerghatta National Park and the Koppal District in Karnataka in order to observe wild pangolin behavior and expects to obtain the permits by June 2020. After obtaining the necessary permits, Mr. Bindumadhav intends to visit each location at least monthly for the remainder of the year in order to view Indian pangolins in these natural habitats.

40.     Ian Redmond is a renowned wildlife biologist and conservationist, who has long-served as senior wildlife consultant for Born Free USA. He also serves as an Ambassador for the UN Convention on Migratory Species. Throughout his professional career, Mr. Redmond has conducted investigations into wildlife trade, and he has seen pangolins for sale both alive on the roadside and dead in bushmeat stalls in Africa, specifically in the Democratic Republic of Congo and Gabon.

41.     Mr. Redmond travels around the world in his work to protect wildlife. He frequently explores forests at night to look for nocturnal wildlife, including pangolins, and often

encourages his clients, including journalists, film-makers, and special interest tours, to join him. For example, in January 2020, Mr. Redmond traveled to India where he visited national parks and elephant sanctuaries; that trip is ongoing at the time of filing this Complaint. During this trip, he has attempted and will continue to attempt to see an Indian pangolin alive in its natural habitat. In April 2020, Mr. Redmond has concrete plans to travel to Uganda and Rwanda and will again attempt to see pangolins that inhabit that region in the wild.

42.     Paul Thomson is a member of NRDC who leads pangolin conservation efforts throughout Africa and Asia via several different roles. First, Mr. Thomson is the Director of Conservation Programs at the Wildlife Conservation Network ("WCN"), where he provides grants to pangolin conservation projects through the Pangolin Crisis Fund. He also runs Save the Pangolins, a non-profit organization he co-founded in 2007 to address illegal trade of pangolins. Finally, he serves as Vice Chair of the Species Survival Commission's Pangolin Specialist Group of the IUCN, a position he has held since 2012.

43.     In these capacities, Mr. Thomson travels to Africa and Asia on a regular basis to assist local groups conserving pangolins, research the pangolin trade, train pangolin conservationists, visit pangolin conservation groups funded by WCN and Save the Pangolins, and view pangolins for pleasure. For example, in 2008 Mr. Thomson went on safari in Botswana's Okavango Delta to look for Temminck's pangolins. In 2016, he visited Cameroon to train young conservationists from Central Africa on pangolin conservation and visited bushmeat markets in Yaounde to assess trade in black-bellied (or long-tailed), giant, and white-bellied (or tree) pangolins. In July 2017, he traveled to Singapore to participate in the Sunda Pangolin Conservation Planning Workshop and track Sunda pangolins in the wild. In 2017, he visited the Phinda Game Reserve in South Africa to search for pangolins. In 2017, he visited the Tikki

Hywood Foundation—an organization in Harare, Zimbabwe, that rehabilitates pangolins captured by poachers, among other endeavors—to liaise on strategy and husbandry levels. And in 2019, Mr. Thomson traveled to Kenya for a safari in search of pangolins in the Masai Mara National Reserve.

44.     Mr. Thomson has concrete plans to return to pangolin habitat for work and recreational purposes. Specifically, he has three trips planned in 2020 and 2021 to the pangolin range states of the Central African Republic, South Africa, and Vietnam. This year, he will travel to Vietnam's Ninh Binh province to visit Save Vietnam's Wildlife—a pangolin conservation group funded by Save the Pangolins and, now, WCN. From September 28 – October 1, 2020, he will visit South Africa's Kruger National Park to speak at the 2nd International Pangolin Conference, followed by a side trip in Kruger to view pangolins in the wild, as well as another possible trip to the Kalahari. In 2021, Mr. Thomson will lead a donor safari to the Central African Republic and South Africa to visit researchers studying pangolins.

45.     Jessa Belle Garibay is another NRDC member who works towards pangolin conservation and views pangolins for recreational purposes. Ms. Garibay was born and raised in the island province of Palawan, the Philippines—the only place on Earth where the Philippine (or Palawan) pangolin is found. As a local, Ms. Garibay is very familiar with the elders' stories of how abundant Philippine pangolins once were. Now, few are lucky enough to see this species, though Ms. Garibay looks for them regularly on visits home and personally encountered a pangolin on a hiking trip in 2016. Ms. Garibay also works to protect pangolins in her role as the co-executive director and co-founder of Centre for Sustainability PH, Inc. (CSPH), a youth women-led environmental non-profit organization that aims to conserve the Philippines' remaining Key Biodiversity Areas. Through her work, Ms. Garibay works to conserve some of

the Philippine pangolins' last remaining habitats, including Cleopatra's Needle Critical Habitat, an area that CSPH and partners successfully lobbied to have converted into a protected reserve.

46.     Ms. Garibay has concrete plans to return to Philippine pangolin habitat. She hikes about every weekend, either for work or for pleasure, and always hopes to find a pangolin, even though they are elusive. CSPH also recently initiated a project in Southern Palawan within the Philippine pangolin's range where Ms. Garibay and her team will conduct a rapid biodiversity assessment of species, including Philippine pangolins. The goal of the project is to document the diverse wildlife to convince the Philippine government and others to protect this unique area.

47.     Defendants' violations have directly, adversely, and irreparably harmed Plaintiffs and their members' interests in pangolins. This harm is ongoing and will continue unless and until this Court provides the relief prayed for in this Complaint.

48.     The relief sought in this Complaint would redress Plaintiffs' injuries. ESA listing would provide pangolins with important protections and benefits. The ESA generally bans the import, export, and sale of endangered species in interstate and foreign commerce, 16 U.S.C. § 1538(a), and requires the Service to issue regulations deemed "necessary and advisable" for the conservation of threatened species, *id.* § 1533(d). The ESA also provides for "international cooperation" in the conservation of foreign species. *Id.* § 1537. ESA listing increases awareness of listed species and their threats; stimulates research efforts to address conservation needs; and increases funding for conservation of species in their range countries, including habitat conservation. Under the ESA, the Service provides financial assistance for programs to conserve listed species in foreign countries, encourages conservation programs for such species, and offers other related assistance, such as personnel and training.

49.     Therefore, Plaintiffs and their members are injured by both Defendants' failure to make a timely listing decision under the ESA and Defendants' failure to take final action on Plaintiffs' ESA Section 4(e) petition. Defendants' protracted failure to act prevents the application of the ESA's substantive protections that are vitally important to pangolin survival and eventual recovery. These injuries are actual, concrete injuries that are presently suffered by Plaintiffs and their members; are directly caused by Defendants' acts and omissions; and will continue to occur unless the Court grants relief. The relief sought herein would redress these injuries. Plaintiffs and their members have no adequate remedy at law.

**Defendants**

50.     Defendant David Bernhardt is the Secretary of the U.S. Department of the Interior. In this capacity, Secretary Bernhardt directs all business of the Department of the Interior. Pursuant to the ESA, Secretary Bernhardt is responsible for determining whether species are endangered or threatened and for promulgating regulations to list and protect those species. In his official capacity, Secretary Bernhardt is responsible for the violations alleged in this Complaint.

51.     Defendant U.S. Fish and Wildlife Service ("the Service") is an agency within the Department of the Interior. The Secretary of the Interior has delegated to the Service the authority to administer the ESA for many species of wildlife, 50 C.F.R. § 402.01(b), including the responsibility of complying with the ESA's mandatory listing deadlines. This authority encompasses proposed and final listing decisions for the pangolins.

## FACTUAL AND STATUTORY BACKGROUND

**A.      Pangolins**

52.      Pangolins are the only mammals with scales. These charmingly-odd, termite-eating animals inhabit tropical and subtropical forests, bush, and open savannah regions in Africa and Asia. They are shy, nocturnal animals that remain in their burrows during the day and come out at night to hunt.

53.      Pangolins have extremely long, sticky tongues that can be the length of their entire bodies as well as a keen sense of smell, which enable them to find and consume their primary food sources: termites and ants. Pangolins have no teeth and instead possess a gizzard-like stomach that is specially adapted for grinding food.

54.      Female pangolins have lengthy gestation periods, typically producing only one young per year. As such, they are unlikely to recover quickly from events that reduce their population size. The pangolins' life history makes them vulnerable to extinction.

55.      In much of China and Southeast Asia, pangolins have been driven to the brink of extinction by increasing demand from consumers in China and Vietnam, where their scales are erroneously believed to have healing powers and pangolin meat is a delicacy. Asian demand for pangolins and their parts is so strong that it also affects the African pangolin species through international trade. In Africa, pangolins are already the subject of domestic overuse, as they are a favored bushmeat and their parts are used for traditional medicine. As Asian pangolin populations have declined, international trade in African pangolins has increased, placing even more pressure on these already-imperiled animals. A 2019 publication estimated that scales from more than 400,000 African pangolins were seized en route to Asian markets between 2015 and July 2019.

56.     Despite international and foreign laws intended to protect pangolins from capture, killing, and trade, an estimated one million pangolins were removed from the wild from 2004-2014, making them the world's most illegally trafficked mammal.

57.     While most of the demand is in Asia, there is a market for pangolin parts in the United States as well. At least 26,000 imports of pangolin products were seized in the United States between 2004 and 2013.

58.     Products containing pangolin parts are openly advertised for sale online and at U.S. stores as purported medicinal products.

59.     For example, as of the date of this Complaint, a North Carolina company is advertising a wellness product called Xian Fang Huo Ming Yin, which lists the Chinese pangolin ("Squama Manitis Pentadactylae (chuan shan jia)") as an ingredient. *See* https://www.goldenneedleonline.com/Xian-Fang-Huo-Ming-Yin-500-gram-powder.html.

60.     All eight species of pangolin are in danger of extinction from international trade and habitat destruction.

61.     All pangolin species are listed on the IUCN Red List of Threatened Species. In December 2019, the IUCN updated its Red List and concluded that three pangolin species—the tree, giant ground, and Philippine pangolin—had moved closer to extinction and no pangolin species' statuses had improved. The Philippine pangolin, Chinese pangolin, and Sunda pangolin are classified as Critically Endangered (extremely high risk of extinction) by the IUCN. The tree pangolin, the giant ground pangolin, and the Indian pangolin are classified as Endangered (very high risk of extinction). The long-tailed pangolin and Temminck's ground pangolin are listed as Vulnerable (high risk of extinction).

62.     In 2016, the CITES Parties voted to move all pangolin species from Appendix II of CITES to Appendix I, thereby banning international commercial trade in pangolins and their parts. Pursuant to CITES, species listed under Appendix I are "threatened with extinction."

63.     Yet only one species—the Temminck's ground pangolin—is currently listed under the ESA, despite the best available science indicating that all pangolin species are either in or are predicted to be in serious decline.

64.     The Service listed the Temminck's ground pangolin as endangered in 1976, and thus imports of and interstate trade in the species is prohibited under the ESA. However, pangolin species are extremely difficult to distinguish from each other—particularly in their most commonly-traded form of scales and powdered derivatives. Both the CITES Secretariat and the CITES Animals Committee noted that the "look-alike problem" between species' scales hindered effective regulation of international trade in the species. Even when the body is intact, pangolins generally look so similar that it makes it difficult for enforcement officials to differentiate between the listed and unlisted pangolins.

65.     Accordingly, there is a substantial risk that the United States is allowing the interstate trade of Temminck's ground pangolin, in violation of the ESA. ESA protections are urgently needed to protect all eight species from further decline.

**B.      The Endangered Species Act**

66.     Recognizing that endangered and threatened species are of "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," Congress enacted the ESA in 1973 "to provide a program for the conservation of" these species and "a means whereby the ecosystems upon which [these] species depend may be conserved." 16 U.S.C. § 1531(a)(3), (b).

67.     To this end, Section 4 of the ESA requires the Secretary of the Interior to
determine whether any species is "endangered" or "threatened," and if so, list the species under
the ESA. 16 U.S.C. § 1533(a), (c). The Secretary has delegated its administration of the ESA to
the Service. 50 C.F.R. § 402.01(b).

68.     A "species" is "any subspecies of fish or wildlife or plants, and any distinct
population segment of any species of vertebrate fish or wildlife which interbreeds when mature."
16 U.S.C. § 1532(16). An endangered species is any species that "is in danger of extinction
throughout all or a significant portion of its range." *Id.* § 1532(6). A threatened species is any
species that "is likely to become an endangered species within the foreseeable future throughout
all or a significant portion of its range." *Id.* § 1532(20).

69.     The Service must list a species if it is endangered or threatened due to: "(A) the
present or threatened destruction, modification, or curtailment of its habitat or range; (B)
overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or
predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or
manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1). The Service must
make listing determinations "solely on the basis of the best scientific and commercial data
available to him after conducting a review of the status of the species." *Id.* § 1533(b)(1)(A);
*accord* 50 C.F.R. § 424.11(b).

70.     The Service may "treat any species as . . . endangered . . . or threatened . . . even
though it is not listed" under the ESA. 16 U.S.C. §1533(e). To do so, the Service must find: (a)
the non-listed species "so closely resembles in appearance, at the point in question, a species"
listed as threatened or endangered "that enforcement personnel would have substantial
difficulty" differentiating the species; (b) the species' resemblance "is an additional threat to an

endangered or threatened species;" and (c) "such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of [the ESA]." *Id*; *accord* 50 C.F.R. § 17.50(a), (b).

71.     Once a species is listed under the ESA, prescribed protections apply.

72.     Section 7(a) of the ESA requires that each federal agency "shall . . . utilize [its] authorities [to] carry[ ] out programs for the conservation" of listed threatened and endangered species. 16 U.S.C. § 1536(a)(1). The same section also requires that each federal agency "shall" consult with the relevant expert agency (for pangolins, the Service) to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence" of a listed species. *Id.* § 1536(a)(2).

73.     Section 9 of the ESA generally prohibits the "tak[ing]" of any endangered species within the United States or its territorial sea without authorization from the Service. 16 U.S.C. §§ 1538(a)(1)(B)-(C), 1539. Section 9 also prohibits the import, export, transport, and sale of any endangered species in interstate or foreign commerce. *Id*. § 1538(a)(1)(A), (E), (F).

74.     The ESA also authorizes the Service to provide financial and other assistance for programs that conserve foreign ESA-listed species. 16 U.S.C. § 1537(a). The ESA further authorizes and directs the Service through the U.S. Secretary of State to encourage foreign nations to conserve listed species and enter the United States into treaties and other agreements to provide for such conservation. *Id.* § 1537(b)(1), (2).

75.     To ensure the timely protection of species that are at risk of extinction, Congress established a detailed and time-bound process whereby citizens may petition the Service to list a species as endangered or threatened and the Service must respond.

76.     Specifically, "[t]o the maximum extent practicable, within 90-days" of receiving a listing petition, the Service must make an initial "finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). The finding is referred to as a "90-day finding."

77.     If the Service determines that listing may be warranted, it must conduct a full scientific review of the species' status, which is known as a "status review." 16 U.S.C. § 1533(b)(3)(A). Then, within 12 months of receiving the petition, the Service must make one of three findings: (1) listing is "warranted;" (2) listing is "not warranted;" or (3) listing is "warranted but . . . precluded" by other pending listing proposals, provided certain requirements are met. *Id.* § 1533(b)(3)(B). The finding is referred to as a "12-month finding."

78.     If the Service's 12-month finding concludes that listing is warranted and not precluded, the agency must "promptly publish" a proposed regulation to list the species as endangered or threatened in the Federal Register for public comment. 16 U.S.C. § 1533(b)(3)(B)(ii). Within one year of publication of the proposed regulation, the ESA requires the Service to render its final determination on the proposal. *Id.* § 1533(b)(6)(A). This is known as a "final listing determination." At such time, the Service must either list the species, withdraw the proposed listing rule, or if there is substantial disagreement about scientific data, delay a final determination for up to six months to solicit additional scientific information. *Id.* § 1533(b)(6)(A)(i), (B)(i).

79.     The ESA's strict protections do not safeguard species at risk of extinction until the Service lists the species as endangered or threatened. Accordingly, it is critical that the Service strictly comply with the Act's listing procedures and deadlines to ensure species are listed in a timely manner.

**C.      The Administrative Procedure Act**

80.      The Administrative Procedure Act ("APA") provides general rules governing how federal agencies propose and establish regulations and issue other decisions. 5 U.S.C. §§ 551 – 706.

81.      The APA requires that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

82.      The APA further requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it," 5 U.S.C. § 555(b), and that agencies give "prompt notice" if they deny a petition, providing "a brief statement of the grounds for denial." *Id.* § 555(e).

83.      Any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," has a cause of action under the APA. 5 U.S.C. § 702. Agency action includes an agency's "failure to act." *Id.* § 551(13).

84.      The APA requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

**D.      Plaintiffs' Petitions and Defendants' Failure to Act**

85.      Recognizing the perils pangolins face due to overutilization, international trade, habitat destruction, and inadequate regulatory mechanisms, Plaintiffs submitted a petition in July 2015 to list seven pangolin species under the ESA.

86.      Also in July 2015, Plaintiffs submitted a second petition, pursuant to ESA section 4(e), requesting that the Service issue a rulemaking to treat the seven unlisted pangolin species as

endangered based on their similarity in appearance to the ESA-listed Temminck's ground pangolin.

87.    The Service issued a combined, positive 90-day finding on the two petitions on March 16, 2016, in which it determined that listing all seven pangolin species may be warranted due to factors identified in the petitions. 16 U.S.C. § 1533(a)(1)(A)-(B), (D)-(E); 81 Fed. Reg. 14,058 (Mar. 16, 2016).

88.    More than four years have passed since Plaintiffs filed their 2015 petitions, but the Service has not issued a 12-month finding on Plaintiffs' ESA-listing petition, nor has it provided a substantive response to or taken final action on Plaintiffs' ESA Section 4(e) petition.

## CLAIMS FOR RELIEF

### Violation of the Endangered Species Act

89.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth below.

90.    Defendants' protracted and ongoing failure to make the statutorily required 12-month finding on the Plaintiffs' petition to list the pangolin as endangered violates the Endangered Species Act. 16 U.S.C. § 1533(b)(3)(B).

### Violations of the Administrative Procedure Act

91.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth below.

79.    The Service's protracted and ongoing failure to issue a substantive response and take final action on Plaintiffs' ESA Section 4(e) petition to list the pangolin as endangered based on similarity of appearance to the ESA-listed Temminck's ground pangolin constitutes an agency

action "unlawfully withheld or unreasonably delayed" and violates the APA. 5 U.S.C. §§ 555(b), 706(1).

## REQUEST FOR RELIEF

Plaintiffs respectfully request this Court:

A.      Declare that Defendants have violated and continue to violate the ESA by failing to issue a 12-month finding as to whether listing the pangolin under the ESA is warranted;

B.      Declare that Defendants violated the APA by failing to respond to Plaintiffs' Section 4(e) petition to treat the pangolin as endangered based on similarity of appearance to the ESA-listed Temminck's ground pangolin;

C.      Order Defendants to issue, by a date certain, a finding as to whether listing the pangolin under the ESA is warranted, 16 U.S.C. § 1533(b)(3)(B);

D.      Order Defendants to respond to Plaintiffs' ESA Section 4(e) petition by a date certain;

E.      Award Plaintiff its attorneys' fees and costs in this action as provided by the ESA, 16 U.S.C. § 1540(g)(4), and/or the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F.      Provide such other and further relief this Court deems just and proper.


Dated:  January 22, 2020                  Respectfully submitted,

                                           /s/ Sarah Uhlemann
                                          Sarah Uhlemann
                                          DC Bar No. 501328
                                          Center for Biological Diversity
                                          2400 80th Street NW, #146
                                          Seattle, WA 98117
                                          (206) 327-2344
                                          suhlemann@biologicaldiversity.org

Nicholas Arrivo
*Application for admission pending*
The Humane Society of the United States
1255 23rd St. NW, Suite 450
Washington, DC 20037
(202) 676-2339
narrivo@humanesociety.org

*Attorneys for Plaintiffs Center for Biological
Diversity, Humane Society International, The
Humane Society of the United States, and Born
Free USA*

Stephen Zak Smith
Natural Resources Defense Council
317 East Mendenhall St., Suite D
Bozeman, MT 59715
(406) 556-9305
zsmith@nrdc.org

*Attorney for Plaintiff Natural Resources
Defense Council*